UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| UNITED STATES LIABILITY INSURANCE CO., INC., AS INSURER OF ADMINASERVICE, INC.<br><br>    Plaintiff,<br><br>v.<br><br>ADVANTIUS, INC., NEAL BERGSTROM, ROBERT STEVENS, CHARLES CAMBRA, III, JONATHAN K. DRIGGS, AND WORKFORCE SOLUTIONS, INC.,<br><br>    Defendants. | CIVIL ACTION NO. 04-11824 PBS |

### AFFIDAVIT OF JEFFREY GARR

I, Jeffrey Garr, hereby state and depose the following:

1. My name is Jeffrey Garr and I am the Chief Executive Officer of AdminaService, Inc., a Massachusetts corporation located in Norton, Massachusetts.

2. I make these statements based upon my own personal knowledge, upon a review of the books and records of AdminaService, Inc. ("AdminaService") or where stated, upon information and belief. I am authorized by AdminaService to make these statements.

3. In December 2001, I began to discuss the establishment of a company in Massachusetts that would provide a full range of outsourced human resource services and management tools to other companies with an individual from New Jersey who was already operating a similar company.

4. After those discussions, in March 2002, I incorporated AdminaSource of New England, Inc.

in Massachusetts. AdminaService, Inc. ("AdminaService") is a successor in interest to Adminasource of New England, Inc. and provides human resource services to companies. Companies hire AdminaService to handle their payroll and benefits administration, to review employee manuals, to conduct training on employment issues or the like. At all relevant times, I have been the President and CEO of AdminaService and AdminaService has had its offices in Massachusetts.

5. Similar to AdminaService, Advantius promoted itself as a company that provided human resource outsourcing services to other companies. A company could hire Advantius to handle its payroll, employment taxes and administrative needs. However, Advantius possessed one thing AdminaService did not: software that calculates the amount of payroll taxes due to the appropriate state or local governments and the Internal Revenue Service. Advantius purchased a license to the software needed to calculate the payroll taxes. Advantius then licensed the use of that software to other companies, including AdminaService.

6. In Spring 2002, I traveled to New York and met with representatives from Advantius. During that meeting Advantius represented to me that it had sufficient funding and that it could provide the services AdminaService needed. It represented to me that it knew how to correctly calculate the taxes and forward them to the IRS and other taxing agencies in a timely manner and in a format acceptable to the IRS.

7. Thereafter, Advantius made numerous misrepresentations about itself during conversations with me and via the literature and other materials provided to AdminaService.

8. I had numerous conversations with Neal Bergstrom and other individuals working at

Advantius. At all relevant times, Neal Bergstrom served as Advantius' Chief Executive Officer.

9. During telephone conversations I had with individuals at Advantius, Bergstrom and Stevens were repeatedly referred to as elders in the Mormon Church. Advantius represented that Bergstrom and Stevens were upstanding citizens to bolster the company's credibility.

10. Bergstrom and Stevens also made several misrepresentations to me as the owner of AdminaService. They indicated that Advantius could not obtain insurance or bonding because it was a new company. Bergstrom and Stevens also told me that they would never steal the funds they were withdrawing to pay taxes because they would go to jail.

11. These material misstatements of fact were made to me, among other places, during telephone conversations with Neal Bergstrom while he was in Utah and I was in Massachusetts.

12. Advantius and AdminaService entered into an arrangement whereby Advantius was to calculate the amount of federal employment taxes owed by AdminaService's clients, withdraw that money directly from the account of AdminaService's client and then forward those sums to the Internal Revenue Service or state/local taxing authorities. The number to be calculated had to be precise and paid on time. Otherwise, the taxing authority would charge AdminaService's clients penalties and late fees.

13. In exchange for these services, AdminaService paid Advantius approximately $100,000 during their 18 month relationship. Advantius also provided identical services to another Massachusetts company, HR Knowledge. In April 2003, to the best of my knowledge, the two Massachusetts companies, HR Knowledge and Advantius accounted for approximately one-half of Advantius' business.

14. Most of my clients are Massachusetts businesses. AdminaService used Advantius for all of its clients during this time. Advantius had access to and withdrew funds from each of my clients' bank accounts in order to pay payroll taxes.

15. From April 2002 until September 2003, Neal Bergstrom spoke with me and other individuals at AdminaService via telephone with great regularity. I personally spoke to Bergstrom several times a week during this period. At times, we spoke multiple times a day. Other employees of AdminaService spoke to Bergstrom regularly – on a daily or weekly basis. AdminaService also communicated with Bergstrom by email and fax with the same frequency. The subjects of the communications ranged from calculating payroll taxes, to new client set-up and departing client close-outs, fixing missed or incorrect payments made by Advantius and other business related issues.

16. Advantius was never adequately funded. During its operation, the company, upon information and belief, did not follow corporate practices and procedures. Advantius did not use separate accounts for its operations and for holding funds in escrow for its clients. Advantius regularly used funds taken from client's accounts to be paid to the IRS for its operating expenses.

17. Advantius repeatedly erred while calculating tax payments for AdminaService's clients. Bergstrom lied to AdminaService on numerous occasions regarding the reasons for missed or late tax payments. Each time an error occurred Bergstrom would reassure AdminaService that the error was minor or a software glitch or that it had been taken care of and assuage AdminaService's concerns. The defendants repeatedly reassured AdminaService that everything was fine and that the company was stable, competent and able to perform its job.

In reality, one or more of the defendants took the funds and used them for operating and personal expenses.

18. On or about April 30, 2003 or May 1, 2003, Advantius withdrew funds from one of AdminaService's clients, Sapers & Wallack Insurance Company, Inc., ("Sapers & Wallack") for the purpose of paying the federal employment taxes Sapers & Wallack owed to the Internal Revenue Service. Sapers & Wallack is a company with its principal place of business in Massachusetts. It held a bank account in its corporate name at Boston Bank and Trust, a bank with offices located in Massachusetts. The funds at issue were withdrawn from Massachusetts and transferred to Advantius in Utah via wire transfer.

19. Unfortunately, instead of depositing those funds with the Internal Revenue Service, one or more of the Defendants diverted $648,497.73 in funds for their own use. Advantius and the other defendants, including Neal Bergstrom, secreted this knowledge and neither Sapers & Wallack, nor AdminaService knew that the funds were converted by Advantius until four months later.

20. In or about August 2003, the IRS seized various accounts of Advantius. Only then did Advantius notify AdminaService that it had not paid the $648,497.33 to the IRS on Sapers and Wallack's behalf.

21. Neal Bergstrom and Robert Stevens telephoned in late August 2003 to notify me of the missing funds. During the numerous telephone conversations that followed, I learned from Bergstrom and Stevens that Sapers and Wallack's funds had not been sent to the IRS. Bergstrom and Stevens claimed that the funds had been used to pay other clients' tax bills, for operating expenses or were possibly seized by the IRS during its raid.

22. The IRS looked to Sapers & Wallack to pay the $648,497.73 in taxes, plus interest and penalties. Sapers & Wallack filed a claim against AdminaService based on the contract between them and sought to collect the money owed. USLI defended AdminaService in the arbitration action before the American Arbitration Association known as Sapers & Wallack Insurance Co., Inc. v. AdminaService, Inc. d/b/a AdminaSource of New England, Inc., Arbitration No. 11 Y 145 02122 03.

23. In settlement of the arbitration, AdminaService paid the Internal Revenue Service in settlement of the debt owed by Sapers & Wallack, plus attorneys fees for Sapers & Wallack's and AdminaService's attorneys fees and costs. USLI, as insurer, stands in the shoes of AdminaService to recover in this action.

24. Bergstrom made regular contact with AdminaService to foster their relationship throughout the eighteen months that AdminaService and Advantius did business.

SWORN AND SUBSCRIBED TO UNDER THE PAINS AND PENALTIES OF PERJURY THIS _1_ DAY OF DECEMBER 2004.

_____
Jeffrey Carr, President and CEO of
AdminaService, Inc.